IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 114,836

In the Matter of KERRY DALE HOLYOAK,
*Respondent*.

ORIGINAL PROCEEDING IN DISCIPLINE

Original proceeding in discipline. Opinion filed June 10, 2016. Indefinite suspension.

*Kate F. Baird*, Deputy Disciplinary Administrator, argued the cause, and *Alexander M. Walzcak*, Deputy Disciplinary Administrator, and *Stanton A. Hazlett*, Disciplinary Administrator, were on the formal complaint for the petitioner.

*Kerry Dale Holyoak*, respondent, argued the cause pro se.

*Per Curiam*: This is an original proceeding in discipline filed by the office of the Disciplinary Administrator against the respondent, Kerry Dale Holyoak, of Leawood, an attorney admitted to the practice of law in Kansas in 1989.

On March 23, 2015, the office of the Disciplinary Administrator filed a formal complaint against the respondent alleging violations of the Kansas Rules of Professional Conduct (KRPC). The respondent filed an answer on April 9, 2015. A hearing was held on the complaint before a panel of the Kansas Board for Discipline of Attorneys on July 1, 2015, where the respondent was present and was represented by counsel. The hearing panel determined that respondent violated KRPC 5.4(d) (2015 Kan. Ct. R. Annot. 639) (professional independence of a lawyer); 7.1(a) (2015 Kan. Ct. R. Annot. 653) (communications concerning a lawyer's services); 8.4(c) (2015 Kan. Ct. R. Annot. 672)

1

(engaging in conduct involving misrepresentation); and 8.4(g) (2015 Kan. Ct. R. Annot. 672) (engaging in conduct adversely reflecting on lawyer's fitness to practice law).

Upon conclusion of the hearing, the panel made the following findings of fact and conclusions of law, together with its recommendation to this court:

"*Findings of Fact*

. . . .

"8. Wilson County Holdings, LLC (WCH), a subsidiary of Stranded Oil Resources Corporation based in Austin, Texas, developed a project to revitalize an oil field located in Fredonia, Kansas. To carry out the project, they sought to purchase mineral rights within the City of Fredonia from individual lot owners, based on the size of each lot.

"9. On January 30, 2013, Donald Missey, Project Manager for WCH, sent the respondent and his wife an offer to purchase the mineral rights associated with his residential property and commercial property. The total mineral purchase price for the respondent's two properties totaled $938.52.

"10. On February 1, 2013, the respondent and his wife, Kerry I. Holyoak, sent Mr. Missey a letter rejecting WCH's offer. The respondent and his wife made a counter offer. The offer to lease their mineral rights for an annual payment of $34,450 plus .689% of revenues in excess of $5,000,000 annually. In addition, the respondent's letter provided:

'To date we have chosen not to share our research, data or any information related to this offer with anyone. We recognize the sensitivity of such a proposal and would agree to sign a confidentiality and non-disclosure agreement. This counterproposal is valid until 5:00 PM on Friday, February 15, 2013.'

2

"11.    On February 12, 2013, Mr. Missey responded to the respondent's offer. Mr. Missey told the respondent that he had passed their offer on to their management team for evaluation. It appears that WCH did not accept or reject the respondent's counter offer during the time allotted.

"12.    On April 29, 2013, the respondent and his wife wrote to Mr. Missey again. In that correspondence, they clearly stated they were only willing to consider leasing their mineral rights. They made a new offer. According to their April 29, 2013, letter, they were willing to accept a lease signing bonus of $35,156.25 plus annual royalties of 3/16 for their relative portion of the pooled units [(gross revenue x .1875) x .05]. In addition to making an additional offer, the respondent and his wife posed a number of detailed questions regarding the project to Mr. Missey at that time.

"13.    On May 17, 2013, Mr. Missey wrote to the respondent and his wife and rejected their latest offer. Through Mr. Missey, WCH made another proposal to the respondent and his wife.

"14.    On June 3, 2013, the respondent and his wife made a verbal presentation to the mayor and commissioners of Fredonia at the regularly scheduled City Council meeting. They expressed their concerns about the mineral rights of the residents of Fredonia, Kansas, related to the project being conducted by WCH.

"15.    On August 5, 2013, the respondent and his wife wrote to the Fredonia, Kansas, City Manager and Mr. Missey. The respondent provided a proposed franchise agreement. According to the respondent, he and his wife 'discussed this proposed franchise agreement with numerous citizens' who were 'willing to sign a petition or vote in a special election.' Also according to the respondent, the proposed franchise agreement sought to accomplish the following:

'1.    Pool the mineral rights of the residents of the entire city [*sic*] of Fredonia, Kansas;

3

'2.     Authorize a lease of said mineral rights to Wilson County
        Holdings, LLC for the purpose of horizontally drilling under
        the city [*sic*] for the exploration and production of oil and gas
        minerals;

'3.     Require Wilson County Holdings, LLC to compensate each
        landowner their proportionate share of a 3/16 royalty on
        production of all gas and oil gross revenues;

'4.     Require Wilson County Holdings, LLC to properly survey the
        entire city [*sic*] of Fredonia in order to accurately determine
        the square footage allocation of each parcel owner, in an
        effort to illustrate an accurate representation of the mineral
        owner's percentage of the overall pool, for future
        compensation purposes;

'5.     Establish procedures for responding to emergencies;

'6.     Require specific performance from Wilson County Holdings,
        LLC whenever there is an incident of damage reported that
        has been caused by their drilling and exploration activities;

'7.     Revert ownership of mineral rights that have been sold to
        Wilson County Holdings during the period January 2011 to
        date, to the original surface owner, and treat payments made
        for said sales, as advances on future royalties.'

"16.    On May 16, 2014, the respondent and his wife wrote to WCH. In the
letter, the respondent and his wife indicated that they had reconsidered their position
and would agree to sell the mineral rights associated with their residential property
to WCH. However, they indicated their interest in selling the mineral rights was
contingent upon WCH purchasing their home at a price of $250,000 plus moving

4

expenses. The respondent and his wife indicated that they were only interested in leasing the mineral rights associated with their commercial property.

"17. On May 29, 2014, Bill Metzler met with the respondent and his wife at their residence. The respondent and his wife told Mr. Metzler that if WCH would pay them $1.9 million, they would agree not to pursue any legal action against WCH due to its underground drilling project. To memorialize that agreement, the respondent and his wife presented Mr. Metzler with a 'Covenant Not to Sue' and 'Purchase Contract.'

"18. Also during that meeting, the respondent and his wife made oral statements and representations concerning the transactions proposed. Mr. Metzler memorialized the respondent's statement in the form of an affidavit, which provided as follows:

'a. Kerry Dale Holyoak is legal counsel to 50 local landowner clients who have engaged him "to bring the company down" and "stop the project";

'b. The Holyoaks prefer to enroll their children in private school and relocate Kerry Dale Holyoaks' [*sic*] law practice in Kansas City but need WCH's help [*sic*] finance that move;

'c. In exchange for payment of $1.9 million the Holyoaks would agree to leave the town "quickly and quietly";

'd. The $1.9 million dollar [*sic*] payment to KWADCO, a Bahamas Corporation, via an offshore wire to an unidentified account at the Royal Bank of Canada;

'e. The landowners opposed to WCH will not do anything if the Holyoaks "don't take the lead for them"; and

5

'f. The Holyoaks will only sign the covenant not to sue if WCH purchases Kerry Dale Holyoak's law practice in addition to the Holyoaks' mineral rights and house, and if WCH refuses, then the Holyoaks will commute from Kansas City to ensure its allies "stand and fight" against WCH.'

The respondent later explained that he was not attempting to sell his law practice. Rather, he agreed to sell his property and in order to value the property, he took into account the value of his law practice.

"19. The 'Covenant Not to Sue' prepared by the respondent and given to Mr. Metzler provides as follows:

'COVENANT NOT TO SUE

'THIS Agreement made and entered this _____day of _____, 2014, by and between Kerry Dale Holyoak and Kerry Irene Holyoak, a married couple (hereinafter referred to as PLAINTIFFS), located at 530 N. 10th Street, Fredonia, KS 66736 and Wilson County Holdings, and Stranded Oil (hereinafter referred to as DEFENDANTS), located at 1135 N 15th St., Fredonia, KS 66736.

'In exchange for the complete compliance of all terms of the PURCHASE CONTRACT for the sale of all real estate owned by the PLAINTIFFS within Wilson County, Kansas, plus the cost of professional movers, and additional consideration in the amount of $_____ (_____millions) paid to (KWADCO, a Bahamas Corporation) the chosen entity to receive compensation for and on behalf of Kerry Dale Holyoak and Kerry Irene Holyoak, by Wilson County Holdings. (Funds to be paid by wire transfer to the Royal Bank of Canada, Account No. _____.)

6

'WITNESSETH:

'1.  PLAINTIFFS, have a cause of action against DEFENDANTS for fraud and misrepresentation with regard to the manner in which DEFENDANTS coerced mineral purchases and mineral leases from the residents within the city limits of Fredonia, Kansas.

'2.  PLAINTIFFS understand that should they initiate a lawsuit against DEFENDANTS for their claims it would cause no less than fifty additional plaintiffs to come forward and file similar lawsuits for similar claims. The potential number of plaintiffs could escalate to as many as have sold or leased their mineral rights to DEFENDANTS under false pretenses, thereby constituting grounds for a class action lawsuit.

'3.  PLAINTIFFS agree not to initiate or participate in any lawsuit or action against DEFENDANTS as counsel, co-counsel, local counsel, witness, plaintiff, party, or otherwise, with regard to any and all of the business activities of DEFENDANTS, within the region of Wilson County, Kansas.

'4.  PLAINTIFFS further agree not to participate in any legal action against DEFENDANTS at any point in the future, as pertaining to the operations of DEFENDANTS in Wilson County, Kansas.

'5.  PLAINTIFFS agree not to provide any legal advice to anyone seeking information about DEFENDANTS and/or their business operations.

'NON-DISCLOSURE AND CONFIDENTIALITY AGREEMENT

'1.  PLAINTIFFS agree to permanently dispose of any and all documentation, records, recordings, witness statements,

7

personal contact information for potential litigants, research and all other forms of discovery as it pertains to evidence which could be used against DEFENDANTS in a lawsuit of any nature.

'2.     PLAINTIFFS agree to relocate their family and business a distance of not less than 75 miles away from Fredonia, Kansas.

'3.     PLAINTIFFS agree not to return to Fredonia, Kansas, except to engage in contacts or business unrelated to potential litigation against DEFENDANTS.

'4.     DEFENDANTS agree to assist PLAINTIFFS with their move by covering the cost of a professional moving company to assist the parties in moving their personal belongings from their home, their office building and their storage unit and relocating them to a new home more than 75 miles away.

'5.     PLAINTIFFS and DEFENDANTS agree not to disclose any of the terms of this agreement. If either party discusses the terms of this agreement, the offending party will bear the burden of the cost of any litigation including reimbursement of attorney fees and expenses for the non-offending party.

'6.     Time is of the essence in this agreement. If DEFENDANTS fail to complete and comply with the terms of this agreement by the _____ day of _____, 2014, then neither party shall be bound by the terms of this agreement and PLAINTIFFS will be free to engage in litigation against DEFENDANTS regarding the extraction of minerals from the city [*sic*] of Fredonia or from any other location and may do so as parties, witnesses, legal counsel and/or support staff or in any other manner for any entity or entities engaged in litigation against

DEFENDANTS or any discussion of or exposure of the actions of DEFENDANTS.

'7.     Bill Metzler, as agent for DEFENDANTS has complete authority to enter into this agreement on behalf of DEFENDANTS and bind the DEFENDANTS to all terms thereof.

'8.     This covenant does not indicate the guilt or innocence of either party.

'This document is the only covenant between PLAINTIFFS and DEFENDANTS regarding litigation against DEFENDANTS, and any statements or provisions made by either party that are not contained in this document are neither valid nor binding.'

"20.     The 'Purchase Contract' prepared by the respondent provided as follows:

'PURCHASE CONTRACT

'THIS CONTRACT made and entered into this _____ day of _____, 2014, by and between KERRY DALE HOLYOAK and KERRY IRENE HOLYOAK, a married couple, of Wilson County, Kansas, (hereinafter called "Sellers"), and _____ as agent for WILSON COUNTY HOLDINGS/STRANDED OIL, a corporate entity of _____, (hereinafter called "Purchaser")

'WITNESSETH:

'1.     Sellers agree to sell and convey to Purchaser and Purchaser agrees to buy and to pay for the following described real

9

property subject to compliance with the following terms and conditions as set forth herein:

> *Lots Eleven (11) and Twelve (12), Block Six (6), Hamilton's Addition to the City of Fredonia* (commonly known as the residence located at 530 N. 10th Street, Fredonia, Kansas 66736)

> *Beginning at the Southwest corner of Lot One (1), Block Fifteen (15), City of Fredonia, thence North 60.36 feet, thence East 34.3 feet, thence South 23.06 feet, thence West 8.7 feet, thence South 7.6 feet, thence West 5 feet; thence South 29.7 feet, thence West 20.6 feet to the point of beginning.* (commonly known as the office building located at 521 Madison Street, Fredonia, Kansas 66736)

'2.    Sellers are the owners of said real property and are not engaged in and have not previously engaged in any litigation which may impact their ownership or control of said property. Sellers have not entered into any other agreements which may impact their ownership or control of said property and have not incurred expenses against and have not suffered any liens to be held against the real property. In the event that any of the conditions set forth in this paragraph have been broken, this transaction shall become void and the purchase funds shall be immediately refunded to Purchaser.

'3.    Purchaser shall pay to Sellers the purchase price of $_____ to be made in one earnest money payment of $10,000.00 plus a lump sum payment of $_____ payable to Sellers as the price of the real property and mineral rights plus $_____ for the Sellers' moving expenses by a commercial moving company.

'4.    Sellers shall have thirty (30) days to remove all unattached items of personal property and vacate the residence and the office building and deliver all keys to Purchaser.

'5.    Sellers agree to deliver and Purchaser agrees to accept the property in its present condition with all attachments and Sellers agree to provide a Warrant [*sic*] Deed to Purchaser.

'6.    All taxes and assessments against the property prior to the date of this agreement and for prior years shall be paid by Sellers. Purchaser shall be responsible for all taxes and assessments coming due from the date of this agreement forward.

'7.    The sale of said real property shall also include the transfer of all Sellers' mineral rights. Sellers are the owners of said mineral rights and are not engaged in and have not previously engaged in any litigation which may impact their ownership or control of said mineral rights. Sellers have not entered into any other agreements which may impact their ownership or control of said mineral rights, have not incurred expenses against and have not suffered any liens to be held against said mineral rights. In the event that any of the conditions set forth in this paragraph have been broken, this transaction shall become void and the purchase funds shall be immediately refunded to Purchaser.

'8.    _____, as agent for Purchaser has complete authority to enter into this agreement on behalf of Purchaser and bind Purchaser to all terms thereof.'

"21.    On June 4, 2014, Mr. Metzler sent an email to the respondent. At that time, Mr. Metzler informed the respondent that their May, 2014, proposal was under review.

11

"22.     The next day, June 5, 2014, the respondent and his wife replied to Mr. Metzler's email message. The respondent and his wife, as a courtesy, informed Mr. Metzler that it was their intention to file a written protest to WCH's petition to the KCC requesting an Order Granting Exception from Casing and Completion Requirements. The respondent and his wife also informed Mr. Metzler that they planned to appear at the hearing set for June 16, 2014, and provide testimony and evidence in support of their concerns. The respondent and his wife set a deadline of June 6, 2014.

"23.     On June 6, 2014, Jonathan Rosen, outside compliance counsel for WCH wrote to the respondent and his wife regarding serious concerns about the May, 2014, offer. Mr. Rosen stated:

> 'We have serious concerns about your proposed and uninvited
> scheme to receive an exorbitant offshore wire to a nominee account
> in exchange for a series of tainted inducements, including the honest
> services of a licensed attorney and an illicit competitive advantage.'

Mr. Rosen included in his correspondence the oral statements made by the respondent as recorded by Mr. Metzler in his affidavit.

"24.     Mr. Rosen also stated:

> 'I specifically note that these representations and assertions are
> memorialized and/or corroborated by the proposed covenant not to
> sue and purchase contract, which you gave to WCH in support of the
> "offer" on May 29, 2014.

> 'We have reviewed these facts and, as a former federal and state
> prosecutor, I believe your scheme implicates significant ethical and
> legal concerns.

12

'First, we have concerns that your proposal betrays Mr. Holyoak's ethical and fiduciary obligations as a licensed attorney.

'Second, you rely on an illicit competitive advantage in an attempt to coerce payment from WCH. Wholly independent of Mr. Holyoak's status as a licensed fiduciary, you purport to be civic leaders who exert influence over a significant number of local landowners. You condition your uninvited promise to abandon these followers and, in your opinion, facilitate the success of WCH's project, only if WCH purchases your business location in addition to your mineral rights and home. Your bad faith implicates state and federal criminal law. See, *e.g.*, K.S.A. 21-6501 (defining extortion, in part, as an act which causes "the competition of the person from whom the payment is demanded, solicited or received to be diminished or eliminated."). See also 18 U.S.C. § 1343 (wire fraud).

'Third, your scheme structures an offshore transaction to a Bahamas shell corporation in an apparent effort to conceal your beneficial interest in any ill-gotten gains. Despite your ready access to local banks, your covenant not to sue requires an offshore wire to a nominee account maintained by a Bahamas corporation, KWADCO. WCH has absolutely no information on the offshore account, the nominee corporation or your compliance with criminal laws requiring that you disclose to the Internal Revenue Service your financial interest or signature authority over such offshore accounts. Moreover, you demanded this specific manner of payment in full knowledge that WCH's prior offer, dated January 30, 2013, specifically identified that payment would be made via a domestic bank draft payable to you individually.

'Fourth, the desperation conveyed with the "offer" is further evidence of bad faith. As reflected by your inability to marshal any support for your bogus claims against WCH and purported plan at the Fredonia

13

City Commission in June 2013, Mr. Holyoak's public masquerade as a citizen attorney general has failed. This is further demonstrated by WCH's past and continuing success in partnering with landowners to support the project. While WCH does not begrudge any prospective seller's good faith effort to maximize his or her self-interest, we strenuously object to using illicit means to achieve your personal ambition.

'Further, yesterday we received additional evidence of your attempt to coerce the elicit [*sic*] payment in the form of your June 5, 2014 e-mail to Mr. Bill Metzler of WCH concerning the Kansas Corporation Commission ("KCC"). In that e-mail, you make the further offer to "forego filing the objection or intervening in any KCC proceedings now or in the future" if WCH pays you the $1.9 million demanded prior to the expiration of the protest period for WCH's applications for exceptions to the KCC. This is further evidence of your continuing practice of bad faith with respect to the project.

'As a good corporate actor in a highly regulated marketplace, WCH has zero tolerance for unethical and illegal conduct. Over the past 18 months, WCH has engaged in a fully transparent process to successfully purchase mineral rights from a substantial number of landowners. WCH remains interested in acquiring such rights at a fair market value, but WCH has never and will never condone or participate in any instance of fraud, extortion or other such matters.

'Please provide your response directly to me concerning the serious items no later than June20, [*sic*] 2014 so that we may continue our review of these issues along with considerations of duties or obligations to disclose all relevant facts to appropriate enforcement, regulatory and licensing authorities.'

"25.     In a letter also dated June 6, 2014, the respondent and his wife responded to Mr. Rosen's letter. The Holyoaks' letter provides:

'We are in receipt of your letter dated June 6, 2014, wherein you have grossly mischaracterized and misunderstood not only our "offer" but also our intentions. We accept your letter as WCH's refusal of our offer to settle.

'It is my understanding that MORRIS, LAING, EVANS, BROCK & KENNEDY, CHARTERED of Wichita, Kansas is counsel of record for WCH in the KCC administrative proceedings. As a matter of courtesy, we are including a copy of our protest to the KCC.

'You have characterized our request for an "exorbitant offshore wire" as though it is some sort of extortion. To be clear, our interests are tied up in real estate and business interests within and around the city [*sic*] of Fredonia, Kansas. Our offer is fair and can in no way be construed as extortion or illicit or illegal. There is nothing illegal about receiving funds in an offshore account. It is called asset protection. [Footnote: Neither in his correspondence nor during his testimony at the hearing on this matter did the respondent satisfactorily explain what he meant by "asset protection."] Your assumptions about our relationship with the IRS are also baseless. We are honest tax payers. Our "offer" was not tied to some arbitrary or fanciful number. These numbers directly relate to the value of our lives in Fredonia, Kansas and are based upon the following:

1.     We have 107-year old Victorian home we value at $250,000 which we have continued to renovate and improve.

2. We have an office building we value at $90,000 which we have also continued to renovate and improve.

3. We have a small town law practice which generates around $330,000 per year in gross revenues. We did a simple "business valuation" of 5 times gross revenue to arrive at the figure of $1,650,000.

'We do not agree with the practices of Wilson County Holdings. We have tried to invite their cooperation in protecting the financial and environmental interests of this community as members of the community and NOT as legal counsel for anyone. However, representatives of WCH have regularly refused to grant leases to small property owners and have offered to purchase mineral rights for a one-time payment of 4 cents per square foot or, in the alternative, that the property owners receive nothing. This does not constitute an "arm's-length" transaction, is not a meeting of the minds, severely lacks any semblance of good faith negotiation and is nothing more than an "it's my [*sic*] or the highway" negotiation. This seems especially unfair since WCH has been aware of the potential value of oil production to the land owners from the outset. Only recently have they granted any leases to a few local small property owners without whom they could not even run horizontal casings.

'At no time have I, Kerry D. Holyoak, announced that I am legal counsel for anyone in any proceeding regarding WCH. My wife and I are concerned citizens who do not agree with the WCH project based upon their refusal to deal fairly with small property owners and their initial promises not to engage in fracking. Our home and our business are directly affected by the drilling and oil production

16

activities of WCH and we have a right to state our concerns and be treated fairly.

'We view our offer as being no different than the farmers who were fairly compensated with millions of dollars to sell their acreage and minerals. Owners of large tracts of land have also been fairly compensated for the value of their minerals by being granted a 3/16 lease. Owners of small tracts of land within the city, such as ours, have been denied any lease by WCH but are instead offered 4 cents per square foot to sell all mineral rights in perpetuity. Therefore, we and other small property owners are being denied fair value for the pooled minerals under our own land and this is in violation of our correlative rights and forms part of the basis for our protest, a copy of which is included for your review.

'Our business is not a farm, but it is a business with value nonetheless. We do not wish to live in a town facing potential ruin by the environmental effects of the WCH project. These environmental concerns are not imaginary but are evident by the WCH request for an exception to the industry standard of cementing wall casings and another exception to allow them to flare gas taken during petroleum extraction. Based on these concerns, we requested that they consider purchasing ALL of our interests and not just our real estate and mineral rights.

'We did tie this to a request to a Covenant Not to Sue and Confidentiality [*sic*] Agreement. We did not do this in any attempt to extort the company. They have the right to proceed with their project and we have the right to protest their actions. In fact, we have the right as citizens to seek redress in administrative and judicial venues whether we first make an offer to settle or not. We believe that certain other residents and citizens of the City of Fredonia may also have valid causes of action for fraud and conversion against Wilson

17

County Holdings. We do not represent them as counsel but we have met with them in the past as friends, neighbors, and fellow citizens and we are willing to help other counsel and further actions against WCH should they want to take action. In the event that we reach a resolution with WCH, I would be surprised if other citizens choose to take action.

'I find it amazing that you choose to use your status to threaten me with potential state and/or criminal prosecution in an effort to gain an advantage for your client in a civil matter and then you choose to characterize my motives as unethical.

'I also find it amazing that you consider it a violation of the federal tax code for someone to use an offshore bank account in order to minimize tax liability.

'I also find it amazing that you appear to characterize WCH as some sort of victim of what you characterize as our "scheme" and fail to see the deceitful manner in which they have dealt with some citizens in order to obtain mineral rights for much less than fair value and deny others any recompense at all.

'You have chosen to call me names and threaten my wife and I and our livelihood. You characterize our attempt to present a franchise agreement to the City of Fredonia and WCH as that of a failed "public masquerade as a citizen attorney general". We did that on our own time and expense as citizens in [*sic*] attempt for all of the small landowners to be treated fairly. The city [*sic*] was not interested in such an agreement as they had already received a lease from WCH. The only response by WCH Representative Don Missey was "that's interesting." We can see now how that effort would be repugnant to WCH in their efforts to purchase small land owner's mineral rights for a pittance and not share with the small landowners

18

the real financial benefits of pumping the oil from underneath their properties.

'Nevertheless we are also mediators and we saw an opportunity to resolve our complaints without litigation. It is a completely normal practice to make such types of agreements in business as we have proposed.

'Based upon your rather demeaning and caustic letter, it appears that WCH is not as interested in reaching any kind of resolution with us as they are in using your position as a former federal prosecutor to intimidate and frighten us from exercising our rights as private citizens and from attempting to negotiate a settlement.

'It was and continues to be our good faith intention to offer WCH an opportunity to avoid litigation and resolve this and future matters.

'Should you have any questions, please feel free to contact this office.

"26.     On July 8, 2014, Jonathan A. Schlatter and Douglas S. Laird filed a complaint against the respondent.

"27.     The respondent's law practice was established as a limited liability company with the Kansas Secretary of State's office. As of June 6, 2014, the respondent listed his wife, Kerry I. Holyoak, as an owner of his law firm. The respondent's wife is not an attorney. The respondent has since corrected this problem.

"28.     The respondent has a website which advertises his legal services. As of June 12, 2014, the respondent's website also featured his wife's services as a

19

mediator. It was unclear from a review of the respondent's website whether the respondent's wife was also an attorney practicing law in the respondent's firm. The respondent has since removed references to his wife from his website.

"*Conclusions of Law*

"29.    In the formal complaint, Mr. Walczak included specific rules which he alleged the respondent violated. In deliberating this matter, in addition to the rules alleged in the formal complaint, the hearing panel considered whether the respondent violated two additional rules:  KRPC 5.3(b) and KRPC 8.4(g).

"30.    It is appropriate to consider violations not specifically included in the formal complaint under certain circumstances. The law in this regard was thoroughly examined in *State v. Caenen*, 235 Kan. 451, 681 P.2d 639 (1984), as follows:

'Supreme Court Rule 211(b) (232 Kan. clxvi), requires the formal complaint in a disciplinary proceeding to be sufficiently clear and specific to inform the respondent of the alleged misconduct.

'The seminal decision regarding the applicability of the due process clause to lawyer disciplinary proceedings is found in *In re Ruffalo,* 390 U.S. 544, 88 S. Ct. 1222, 20 L. Ed. 2d 117, *reh. denied* 391 U.S. 961, 88 S. Ct. 1833, 20 L. Ed. 2d 874 (1968). There the United States Supreme Court held that a lawyer charged with misconduct in lawyer disciplinary proceedings is entitled to procedural due process, and that due process includes fair notice of the charges sufficient to inform and provide a meaningful opportunity for explanation and defense.

'Decisions subsequent to *Ruffalo* have refined the concept of due process as it applies to lawyer disciplinary hearings, and suggest that the notice to be provided be more in the nature of that provided in civil cases. The weight of authority appears to be that, unlike due

20

process provided in criminal actions, there are no stringent or technical requirements in setting forth allegations or descriptions of alleged offenses. . . . Due process requires only that the charges must be sufficiently clear and specific to inform the attorney of the misconduct charged, but the state is not required to plead specific rules, since it is the factual allegations against which the attorney must defend. . . . However, if specific rules are pled, the state is thereafter limited to such specific offenses. . . .

'Subsequent to the *Ruffalo* decision, the due process requirements in lawyer disciplinary proceedings have been given exhaustive treatment by this court. In *State v. Turner*, 217 Kan. 574, 538 P.2d 966 (1975), 87 A.L.R.3d 337, the court summarized prior Kansas and federal precedent on the question, including *Ruffalo*, and held in accordance with established precedent that the state need not set forth in its complaint the specific disciplinary rules allegedly violated . . . , nor is it required to plead specific allegations of misconduct. . . . What is required was simply stated therein:

"'We must conclude that where the facts in connection with the charge are clearly set out in the complaint a respondent is put on notice as to what ethical violations may arise therefrom. . . .

"'It is not incumbent on the board to notify the respondent of charges of specific acts of misconduct as long as proper notice is given of the basic factual situation out of which the charges might result.'"

235 Kan. at 458-59 (some citations omitted). Thus, only when the formal complaint alleges facts that would support findings of violations of additional rules, will considering additional violations be allowed. The hearing panel will address the above-stated law with respect to KRPC 5.3(b) and KRPC 8.4(g) separately below.

21

"KRPC 5.3(b)

"31.    KRPC 5.3(b) provides:

'With respect to a nonlawyer employed or retained by or associated with a lawyer:

. . . .

          '(b)    a lawyer having direct supervisory authority
          over the nonlawyer shall make reasonable efforts to
          ensure that the person's conduct is compatible with
          the professional obligations of the lawyer . . . .'

In this case, the evidence presented at the hearing on this matter clearly established that the respondent failed to supervise a nonlawyer, his wife, as required by KRPC 5.3(b). The formal complaint, however, is void of sufficient facts to put the respondent on notice that he may have violated KRPC 5.3(b). As such, the hearing panel is unable to conclude, based upon *Caenen*, that the respondent violated KRPC 5.3(b).

"KRPC 5.4(d)

"32.    KRPC 5.4(d) provides that:

          'A lawyer shall not practice with or in the form of a
professional corporation or association authorized to practice law for
a profit, if:

          (1)    a nonlawyer owns any interest therein, except
                 that a fiduciary representative of the estate of
                 a lawyer may hold the stock or interest of the

22

lawyer for a reasonable time during administration . . . .'

The respondent formed his law practice as a limited liability company. The respondent's wife, a nonlawyer, was registered as an owner of the company with the Kansas Secretary of State. The respondent stipulated that he violated KRPC 5.4 in this regard. As such, based upon the respondent's stipulation and the facts presented, the hearing panel concludes that the respondent violated KRPC 5.4. (It is worth repeating, the respondent has resolved this issue.)

"KRPC 7.1(a)

"33.    Lawyers must not make false or misleading statements about their services. 'A communication is false or misleading if it . . . contains a material misrepresentation of fact or law, or omits a fact necessary to make the statement considered as a whole not materially misleading.' KRPC 7.1. The respondent stipulated that he violated KRPC 7.1 by including references to his wife and the mediation services that she provides on his law firm's website. On the website, the respondent omitted facts which were necessary to make the website considered as a whole not materially misleading. As such, the hearing panel concludes that the respondent violated KRPC 7.1.

"KRPC 8.4(c)

"34.    'It is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation.' KRPC 8.4(c). The respondent misrepresented information when he communicated with Mr. Missey and Mr. Metzler and when he drafted the covenant not to sue. Specifically, the respondent claimed that he represented 50 other landowners when he did not. As such, the hearing panel concludes that the respondent violated KRPC 8.4(c).

23

"KRPC 8.4(g)

"35.     'It is professional misconduct for a lawyer to . . . engage in any other conduct that adversely reflects on the lawyer's fitness to practice law.' KRPC 8.4(g). With regard to KRPC 8.4(g), the disciplinary administrator included sufficient facts in the formal complaint to warrant consideration of such a violation. Thus, under *Caenen*, the hearing panel concludes that it is proper to consider a violation of KRPC 8.4(g).

"36.     The respondent engaged in conduct that adversely reflects on his fitness to practice law. First, the respondent drafted the covenant not to sue. In that covenant, the respondent included the following provision:

'1.     PLAINTIFFS agree to permanently dispose of any and all documentation, records, recordings, witness statements, personal contact information for potential litigants, research and all other forms of discovery as it pertains to evidence which could be used against DEFENDANTS in a lawsuit of any nature.'

The respondent's offer to destroy evidence is conduct which adversely reflects on his fitness to practice law.

"37.     Second, the respondent offered to settle his claims by having WCH wire transfer $1.9 million dollars to an offshore account in the Bahamas. The respondent stated that he wished to have the money transferred to the offshore account as a form of 'asset protection.' The respondent, however, denied that he was attempting to avoid paying taxes on the money. The respondent was unable to offer any legitimate explanation for 'asset protection.' Based on all the evidence, it is reasonable for the hearing panel to conclude that the respondent was attempting to avoid paying taxes on the money he hoped to get from WCH.

"38.     Thus, the hearing panel concludes that the respondent violated KRPC 8.4(g).

24

"39.     In making this recommendation for discipline, the hearing panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"40.     *Duty Violated*. The respondent violated his duty to the public to maintain his personal integrity. The respondent also violated his duty to the legal profession.

"41.     *Mental State*. The respondent knowingly violated his duties.

"42.     *Injury*. As a result of the respondent's misconduct, the respondent caused actual injury to the legal profession.

"43.     *Aggravating and Mitigating Factors*. Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following aggravating factors present:

"44.     Prior Disciplinary Offenses. The respondent has been previously disciplined on one occasion. In 1993, the disciplinary administrator informally admonished the respondent for violating the rules requiring diligent representation and adequate communication.

"45.     Dishonest or Selfish Motive. The respondent's misconduct was motivated by dishonesty and selfishness. The respondent sought to use unlawful

25

means to obtain $1.9 million. Accordingly, the hearing panel concludes that the respondent's misconduct was motivated by dishonesty and selfishness.

"46. Multiple Offenses. The respondent committed multiple rule violations. The respondent violated KRPC 5.4(d), KRPC 7.1(a), KRPC 8.4(c), and KRPC 8.4(g). Accordingly, the hearing panel concludes that the respondent committed multiple offenses.

"47. Refusal to Acknowledge Wrongful Nature of Conduct. The respondent stipulated that he violated KRPC 5.4(d) (relating to the ownership of his law office) and KRPC 7.1(a) (relating to his website). The respondent, however, refused to admit that he engaged in any misconduct relating to his dealings with WCH. Accordingly, the hearing panel concludes that the respondent refused to acknowledge the wrongful nature of his conduct.

"48. Substantial Experience in the Practice of Law. The Kansas Supreme Court admitted the respondent to practice law in the State of Kansas in 1989. At the time of the misconduct, the respondent has been practicing law for more than 20 years.

"49. Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following mitigating circumstance present:

"50. Remoteness of Prior Offenses. The discipline imposed in 1993 is remote in character and in time to the misconduct in this case.

"51. In addition to the above-cited factors, the hearing panel has thoroughly examined and considered the following Standards:

'5.11   Disbarment is generally appropriate when:

. . . .

(b)      a lawyer engages in any other intentional
          conduct involving dishonesty, fraud, deceit,
          or misrepresentation that seriously adversely
          reflects on the lawyer's fitness to practice.

'5.12   Suspension is generally appropriate when a lawyer
         knowingly engages in criminal conduct which does not
         contain the elements listed in Standard 5.11 and that
         seriously adversely reflects on the lawyer's fitness to practice.

'5.13   Reprimand is generally appropriate when a lawyer knowingly
         engages in any other conduct that involves dishonesty, fraud,
         deceit, or misrepresentation and that adversely reflects on the
         lawyer's fitness to practice law.

'7.2    Suspension is generally appropriate when a lawyer
         knowingly engages in conduct that is a violation of a duty
         owed as a professional and causes injury or potential injury
         to a client, the public, or the legal system.'

"*Recommendation*

"52.    The disciplinary administrator recommended that the respondent be
suspended for a period of 6 months. Counsel for the respondent recommended that
the respondent be permitted to continue to practice and that he be censured by the
Kansas Supreme Court.

"53.    The respondent engaged in serious misconduct which involved
misrepresentations. Based upon the seriousness of the misconduct, a suspension is

27

warranted. Accordingly, based upon the findings of fact, conclusions of law, and the Standards listed above, the hearing panel unanimously recommends that the respondent be suspended for a period of 6 months.

"54.    Costs are assessed against the respondent in an amount to be certified by the Office of the Disciplinary Administrator."

## DISCUSSION

In a disciplinary proceeding, this court considers the evidence, the findings of the disciplinary panel, and the arguments of the parties and determines whether violations of KRPC exist and, if they do, what discipline should be imposed. Attorney misconduct must be established by clear and convincing evidence. *In re Foster*, 292 Kan. 940, 945, 258 P.3d 375 (2011); see Supreme Court Rule 211(f) (2015 Kan. Ct. R. Annot. 350). Clear and convincing evidence is "'evidence that causes the factfinder to believe that "the truth of the facts asserted is highly probable."'" *In re Lober*, 288 Kan. 498, 505, 204 P.3d 610 (2009) (quoting *In re Dennis*, 286 Kan. 708, 725, 188 P.3d 1 [2008]).

Respondent was given adequate notice of the formal complaint, to which he filed an answer, and adequate notice of the hearing before the panel and the hearing before this court. The respondent did not file exceptions to the hearing panel's final hearing reports. As such, the findings of fact are deemed admitted. Supreme Court Rule 212(c) and (d) (2015 Kan. Ct. R. Annot. 369).

The evidence before the hearing panel establishes by clear and convincing evidence the charged misconduct violated KRPC 5.4(d) (2015 Kan. Ct. R. Annot. 639) (professional independence of a lawyer); 7.1(a) (2015 Kan. Ct. R. Annot. 653) (communications concerning a lawyer's services); 8.4(c) (2015 Kan. Ct. R. Annot. 672) (engaging in conduct involving misrepresentation); and 8.4(g) (2015 Kan. Ct. R. Annot.

28

672) (engaging in conduct adversely reflecting on lawyer's fitness to practice law), and it supports the panel's conclusions of law. We adopt the panel's conclusions.

The only remaining issue before us is the appropriate discipline for respondent's violations. At the hearing before the panel, the office of the Disciplinary Administrator recommended that respondent be suspended from the practice of law in the state of Kansas for a period of 6 months. Respondent recommended he be disciplined by public censure. The hearing panel agreed with the office of the Disciplinary Administrator in recommending a 6-month suspension.

At the hearing before this court, at which the respondent appeared, the office of the Disciplinary Administrator recommended that respondent be suspended from the practice of law in the state of Kansas for a period of 6 months. Respondent stated that he was not opposed to a 6-month suspension. This court is not bound by the recommendations of the Disciplinary Administrator or the hearing panel. *In re Mintz*, 298 Kan. 897, 911-12, 317 P.3d 756 (2014). The hearing panel's recommendations are advisory only and do not prevent us from imposing greater or lesser sanctions. Supreme Court Rule 212(f) (2015 Kan. Ct. R. Annot. 369); see *In re Kline* 298 Kan. 96, 212-13, 311 P.3d 321 (2013). After careful consideration, the court holds that a greater sanction is appropriate under the circumstances. The uncontested findings demonstrate respondent committed multiple acts of professional misconduct, the most troubling being: (1) He engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation. KRPC 8.4(c). Here, the respondent misrepresented information when he communicated with Donald Missey and Bill Metzler and in his proposed covenant not to sue. Specifically, the respondent claimed that he represented 50 other landowners when he did not. (2) He engaged in multiple acts of conduct that adversely reflect on his fitness to practice law. KRPC 8.4(g).

29

First, the respondent drafted the covenant not to sue. In that covenant, the respondent included a provision to permanently dispose of any and all documentation, records, recordings, witness statements, personal contact information for potential litigants, research, and all other forms of discovery as it pertains to evidence which could be used by his clients and others against defendants in a lawsuit of any nature. The respondent's offer to destroy evidence is conduct which adversely reflects on his fitness to practice law. Second, the respondent offered to settle his claims by having WCH wire transfer $1.9 million dollars to an offshore account. The respondent stated that he wished to have the money transferred to the offshore account as a form of "asset protection." The respondent, however, denied that he was attempting to avoid paying taxes on the money. The respondent was unable to offer any legitimate explanation for "asset protection." Based on all the evidence, it was reasonable for the hearing panel to conclude that the respondent was attempting to avoid paying taxes on the money he hoped to get from WCH.

The respondent refuses to acknowledge the wrongful nature of his conduct, particularly as it pertains to the covenant not to sue. We rarely see such behavior unaccompanied by any misgivings that reflects so poorly on our profession. We find his conduct, which ultimately evolved into a scheme of bribery and extortion, to be of such a serious magnitude and unconscionable nature that an indefinite period of suspension is warranted. If not fully accepting and appreciating that falsely claiming to the representation of over 50 litigants and offering to destroy all evidence that could be used on their and others' behalf in exchange for wiring $1.9 million to an offshore account is wrongful, nothing short of the action we are taking today will adequately protect the public.

CONCLUSION AND DISCIPLINE

IT IS THEREFORE ORDERED that Kerry Dale Holyoak be indefinitely suspended from the practice of law in the state of Kansas, in accordance with Supreme Court Rule 203(a)(2) (2015 Kan. Ct. R. Annot. 293), as of the date of this order.

IT IS FURTHER ORDERED that respondent shall comply with Supreme Court Rule 218 (2015 Kan. Ct. R. Annot. 401), and in the event respondent seeks reinstatement, he shall comply with Supreme Court Rule 219 (2015 Kan. Ct. R. Annot. 403).

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to the respondent and that this opinion be published in the official Kansas Reports.